# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

N° 08-CV-0297 (JFB) (ETB)

_____

MICHAEL CASTRO,

Plaintiff,

VERSUS

COUNTY OF NASSAU, ET AL.,

Defendants.

_____

**MEMORANDUM AND ORDER**
September 13, 2010

_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Michael Castro brings this action under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and New York State law. The defendants are Bernard Kaplan, Patricia Hugo, Angelo Sabatelli, Dominick Cappelletti, and Colleen Chamblee (collectively "the School-District Defendants"), as well as David DeGasperis and the County of Nassau (collectively "the County Defendants").

This case arises out of the investigation, arrest, prosecution, and acquittal of plaintiff for making a bomb threat. Specifically, on December 8, 2004, someone called 911 and said there was a bomb at Great Neck North High School ("Great Neck North"), where plaintiff worked as a security guard. No bomb was found during a search of the school.

According to the uncontroverted facts, the Nassau County Police, including defendant DeGasperis, a detective in the Sixth Precinct, attempted to determine who was responsible for the hoax. Early on in the investigation, DeGasperis played a tape of the 911 call for several school administrators. After hearing the tape, a number of the administrators told DeGasperis that they believed, with varying degrees of certainty, that plaintiff was the caller. None of them, however, would sign a sworn statement to that effect. No arrest was made at that juncture. Over a month later, DeGasperis returned to the school and played the tape for defendant Chamblee, who, like plaintiff, was a school security guard. Chamblee identified plaintiff as the caller and signed a sworn affidavit attesting to that identification. DeGasperis arrested plaintiff the next day. Plaintiff was charged with

falsely reporting an incident. A jury acquitted him of this charge.

Plaintiff then filed this lawsuit. He brings claims under § 1983 for the following: (1) false arrest; (2) malicious prosecution; (3) use of excessive force by DeGasperis; (4) municipal liability against Nassau County; and (5) First Amendment retaliation by the School-District Defendants. He also brings a claim for a conspiracy under 42 U.S.C. § 1985(3) and a number of pendent state-law claims. All defendants have moved for summary judgment. For the reasons that follow, the Court grants the School-District Defendants' motion in its entirety. The Court grants the County Defendants' motion on all claims except the § 1983 excessive force claim against DeGasperis and the state-law causes of action related to that claim.

In brief, the Court concludes that plaintiff's false-arrest claim fails because, based upon the uncontroverted evidence, Detective DeGasperis had probable cause as a matter of law to arrest him. In particular, it is uncontroverted that, after listening to the 911 call, a school security guard signed a sworn written statement that she had been working with plaintiff on a daily basis for two years and that she was "positive" that the voice on the tape was plaintiff based upon her daily contact and conversations with him. Plaintiff has pointed to no information that the detective had available to him at the time of the arrest to cast doubt on the veracity of the security guard's sworn statement, and no rational jury could make such a finding. Detective DeGasperis also had prior oral statements by other school officials who believed, with varying degrees of certainty, that it was plaintiff's voice on the tape (but were unwilling to sign a written statement). However, the school security guard's statement

and identification of the plaintiff's voice with certainty, by itself, would provide sufficient probable cause as a matter of law to arrest the plaintiff under the circumstances of this case. The existence of probable cause is also a complete defense to any malicious prosecution claim against DeGasperis because there is no evidence that DeGasperis learned any information following plaintiff's arrest that revealed the charges against plaintiff to be groundless. In any event, in the alternative, the Court concludes that DeGasperis is also entitled to qualified immunity on the § 1983 false arrest and malicious prosecution claims. Additionally, the Court grants the School-District Defendants summary judgment on these claims because, even drawing all reasonable inferences in plaintiff's favor, no reasonable jury could find that they were acting under color of state law with respect to plaintiff's arrest and prosecution. Even though some of the School-District Defendants interviewed plaintiff and supplied information to the police, it is well settled that merely supplying information to the police is insufficient, as a matter of law, to turn the School-District Defendants into state actors. Similarly, the Court grants all defendants summary judgment on the § 1985(3) claim because there is no evidence of a conspiracy between any of the defendants, nor is there evidence that any of the defendants bore any discriminatory intent.

With respect to the § 1983 First Amendment retaliation claim, the speech at issue—plaintiff's complaints to defendant Kaplan regarding students violating the school's parking regulations—was at the core of plaintiff's duties as a school security guard. Indeed, one of plaintiff's main responsibilities was to enforce parking regulations. As such, plaintiff was not speaking "as a citizen," and

the First Amendment does not apply to the speech under *Garcetti v. Ceballos*, 547 U.S. 510 (2006). Additionally, no reasonable jury would find a causal connection between the speech at issue and any adverse employment action by the School-District Defendants.

The Court denies summary judgment to defendant DeGasperis on plaintiff's § 1983 excessive force claim and the pendent state law assault and battery claims. These claims stem from wrist injuries allegedly sustained by plaintiff that occurred when DeGasperis placed him in handcuffs during the arrest. Plaintiff asserts that he told DeGasperis that the handcuffs were too tight, that DeGasperis did not loosen the handcuffs, and that he suffered wrist soreness as a result. The Court, viewing the facts in a light most favorable to plaintiff and resolving all factual ambiguities in his favor, cannot conclude that these claims fail as a matter of law on the record here. Instead, there are disputed factual issues—including the extent of the alleged injury—that must be resolved by a jury.

Finally, the Court grants the School-District Defendants summary judgment on the County Defendants' cross-claim claim for contribution and indemnity.

I. BACKGROUND

A. Factual Background

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts. Where one party's Local Rule 56.1 statement is cited, the opposing party either does not deny the assertion or does not support its denial or objection with admissible evidence. Upon consideration of a motion for summary

judgment, the Court construes the facts in the light most favorable to the non-moving party, here the plaintiff. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).[1]

1. The Parties' Job Responsibilities

At all relevant times, Castro was a security guard for Explorer Guard Services and was assigned to work at Great Neck North High School. (GN 56.1 ¶ 1.) At Great Neck North, plaintiff's duties included enforcing student parking and securing the school's perimeter. (GN 56.1 ¶ 2.)

Several of the defendants also work (or worked) at Great Neck North. Again, the Court will refer to these defendants as the "School-District Defendants." Defendant Bernard Kaplan is the school's principal. (GN 56.1 ¶ 9.) Defendant Patricia Hugo is an assistant principal at the school. (GN 56.1 ¶ 10.) Defendant Angelo Sabatelli, now retired, was also an assistant principal during the relevant time period. (GN 56.1 ¶ 11.) Defendant Dominick Cappelletti supervised transportation and security for the Great Neck School District. (GN 56.1 ¶ 12.) Defendant Colleen Chamblee was also a security guard at Great Neck North. She worked inside the school building and, unlike plaintiff, was employed directly by the school district. (GN 56.1 ¶¶ 4-5; Cappelletti Dep. 11:25-12:5.) Plaintiff had positive relationships with each

---

[1] The Court will cite the School-District Defendants' 56.1 statement as "GN 56.1" and the County Defendants' 56.1 as "County 56.1." The Court will cite plaintiff's 56.1 statement responding to the School-District Defendants' motion as "Pl.'s Opp. 56.1 (GN)" and his 56.1 statement responding to the County Defendants as "Pl.'s Opp. 56.1 (County)."

of the School-District Defendants, although he sometimes complained to school principal Kaplan that the school administration was lax in enforcing parking rules. (GN 56.1 ¶ 8; Pl.'s Opp. 56.1 (GN) ¶ 8.)

## 2. The Bomb Threat

On December 8, 2004, somebody called 911 and stated that there was a bomb at Great Neck North. (*See* County 56.1 ¶ 2.) At the direction of Kaplan and Sabatelli, the building was evacuated. (GN 56.1 ¶¶ 15, 17.) The Nassau County Police responded and searched the building. They determined that there was no bomb and that the building was safe. (GN 56.1 ¶¶ 22-24.)

## 3. DeGasperis's Initial Investigation

The Nassau County Police then began an investigation of the bomb threat. Defendant David DeGasperis, a Nassau County police detective, supervised the investigation. The day after the incident, DeGasperis obtained a recording of the 911 call reporting the bomb and asked defendant Kaplan if he would listen to the tape. (GN 56.1 ¶ 25.) Kaplan agreed and DeGasperis went to Great Neck North to play the tape for Kaplan. (GN 56.1 ¶¶ 27-28.) After Kaplan heard the tape, he summoned defendant Hugo to his office so that she could also listen to the tape. (GN 56.1 ¶ 31; Pl.'s Opp. 56.1 (GN) ¶ 31.) Several other school officials may also have been present. (*See, e.g.*, Pl.'s Opp. 56.1 (GN) ¶ 31.)

After hearing the tape, Kaplan told DeGasperis that he believed the voice on the tape was plaintiff's, although the degree of certainty he had is unclear. According to Kaplan's deposition testimony in this case, he told DeGasperis that he was between 90 and 95 percent certain that the voice was plaintiff's. (Kaplan Dep. 30:19-31:5.) Kaplan also testified at plaintiff's criminal trial that he had been "very certain." (Hueston Decl. Ex. E. 14:13-18.) The case report prepared by DeGasperis, however, states only that "Kaplan and 3 staff members . . . were 70% confident." (Hueston Decl. Ex. G.)

There is also evidence that Hugo told DeGasperis she was 70 percent confident plaintiff was the caller. (*See* Hugo Dep. 13:13-22.) Hugo also testified in plaintiff's criminal trial that she heard the tape on December 9, 2004 and told DeGasperis she believed plaintiff was the caller, although she did not recall if she quantified her degree of certainty. (Hueston Decl. Ex. D 10:12-16; 14:24-15:1.) However, at his deposition in this case, taken over four and half years after the events at issue, DeGasperis testified that only defendant Kaplan made an identification at the December 9, 2004 meeting and that he could not recall whether Hugo was present at the meeting. (DeGasperis Dep. 10:22-25; 13:13-17.)[2] Another school official, Diane Edgerton, who is not a defendant here, also heard the tape and was unable to identify the caller. (Pl.'s Statement of Add'l Material Facts ¶ 1.) It is undisputed that none of the

---

[2] Additionally, plaintiff also asserts that "[Detective] DeGasperis testified at [plaintiff's] criminal trial that on December 9, 2004, none of the school officials were confident enough to identify the voice on the 911 [t]ape." (Pl.'s Opp. 56.1 (GN) ¶ 36.) However, this assertion relies on an out-of-context quote from the cross-examination of Detective DeGasperis. On re-direct examination, DeGasperis testified that some people at the school were 70 percent certain, others were "more certain," and some were "absolutely certain." (*See* Hueston Decl. Ex. C. at 11:4-11.)

school officials who heard the tape were confident enough to sign a statement regarding the identification. (Pl.'s Opp. 56.1 (GN) ¶ 34.)

The next day, December 10, 2004, Detective DeGasperis played the tape for defendant Cappelletti. (County Def.'s Ex. B.) Cappelletti also told DeGasperis that he believed plaintiff was the caller, although the record is not entirely clear as to how certain he was. (GN 56.1 ¶ 45; Pl.'s Opp 56.1 (GN) ¶ 45.) Cappelletti testified at plaintiff's criminal trial that he told DeGasperis that he was "sixty, seventy percent" certain;[3] he testified in his deposition that he had said he was "70, 75 percent" certain;[4] and DeGasperis's case report indicates that Cappelletti stated he was "about 70% confident." (Hueston Decl. Ex. G.)

At some point, defendant DeGasperis also played the tape for defendant Sabatelli. (GN 56.1 ¶ 39.) When he first heard the tape, Sabatelli was unsure of the caller's identity. (Pl.'s Opp. 56.1 (GN) ¶ 40.)[5]

In sum, in the two days after the incident, at least two school administrators (Kaplan, Cappelletti, and, in all likelihood, Hugo) had told DeGasperis that they believed the voice on

_____

[3] (Hueston Decl. Ex. A. 8:23-24.)

[4] (Cappelletti Dep. 22:13-16.)

[5] The School-District Defendants' Rule 56.1 statement asserts that Sabatelli was "painfully certain" that the voice on the tape was plaintiff's. However, the cited portion of Sabatelli's deposition testimony does not appear to be dealing with the first time DeGasperis played the tape for Sabatelli. Instead, it seems Sabatelli identified the voice on the tape as plaintiff's only after he heard it again in late January when DeGasperis returned to the school to play the tape for Chamblee. *See infra.*

the 911 tape was plaintiff's. None of these individuals, however, would sign a sworn statement to that effect.

### 3. Events Between December 10, 2004 and January 25, 2005

Around this time, Sabatelli (and possibly Kaplan) had a conversation with plaintiff in which plaintiff denied he was person who called in the bomb threat. (Pl.'s Statement of Add'l Material Facts ¶ 11; Hueston Decl. Ex. G.) On December 18, 2004, Cappelletti called DeGasperis and told him that Kaplan "and the assistant principal" had spoken to Castro but that he, Cappelletti, "did not have any details" and that Kaplan would be calling DeGasperis. (*See* Hueston Decl. Ex. G.) Five days later, DeGasperis called principal Kaplan on the phone. Kaplan reported that plaintiff "remained calm and unsuspicious denying any involvement." (Pl.'s Statement of Add'l Material Facts ¶ 14.) On January 8, 2005, Sabatelli called DeGasperis and left a message; eight days later DeGasperis called back and left a message for Sabatelli. (Hueston Decl. Ex. G) On January 19, 2005, DeGasperis received a telephone call from the school and arranged a meeting for January 25, 2005. (Pl.'s Statement of Add'l Material Facts ¶ 16; Hueston Decl. Ex. G.)

### 4. Chamblee's Identification

On January 25, 2005, DeGasperis returned to Great Neck North and visited Assistant Principal Sabatelli in his office. Defendant Colleen Chamblee, who, like plaintiff, was a school security guard, was also present. (*See* GN 56.1 ¶ 47.) DeGasperis played the 911 tape of the bomb threat for Chamblee. (GN 56.1 ¶ 48.) Chamblee believed the voice was plaintiff's and conveyed this to Sabatelli and

DeGasperis by writing Castro's name down on a piece of paper. (GN 56.1 ¶ 49; Chamblee Dep. 41:15-42:21.) DeGasperis and Sabatelli then told Chamblee to leave the room and return in 30 minutes. (GN 56.1 ¶ 50.) After she returned, DeGasperis again played the tape and Chamblee reiterated her belief that plaintiff was the caller. (GN 56.1 ¶ 51.) DeGasperis subsequently asked Chamblee to come to the Sixth Precinct. She complied and, while there, gave DeGasperis a sworn written statement asserting that she had "been working with [plaintiff] on a daily basis for the last 2 years" and was "positive that the voice on the cassette" was plaintiff's "due to [her] contact and daily conversations with him at work." (*See* County Def.'s Ex. F.)[6]

---

[6] Plaintiff contends, repeatedly, that there are disputed issues of fact regarding Chamblee's identification because Chamblee "had a disciplinary problem concerning absenteeism" and "was investigated for narcotics." (*See* Pl.'s Opp. 56.1 (County) ¶ 22.) As a threshold matter, these assertions in no way controvert the fact that Chamblee told the police that she was certain that the voice on the tape was plaintiff's. Thus, there is no dispute that Chamblee identified plaintiff as the caller. *Cf.* Local Civil Rule 56.1(c) (explaining that facts not "***specifically*** controverted" by a party opposing summary judgment will be deemed admitted for purposes of the motion (emphasis in original)); *accord Pierre-Antoine v. City of N.Y.*, No. 04 Civ. 6987(GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006). Moreover, the narcotics investigation occurred a year *after* the events at issue in this case, and, as discussed *infra*, there is no evidence that DeGasperis was aware of these allegations or of any absenteeism issues Chamblee had.

5. Plaintiff's Arrest and Prosecution

The following day, January 26, 2005, Nassau County detectives, including DeGasperis, went to Great Neck North and arrested plaintiff for falsely reporting an incident, in violation of New York Penal Law § 240.55(2). (GN 56.1 ¶¶ 61-62.) DeGasperis placed plaintiff's hands behind his back and applied handcuffs. (Pl.'s Dep. 65:24-66:3.) At his deposition, plaintiff asserted that he told DeGasperis that the handcuffs were too tight and that DeGasperis did not respond. (Pl.'s Dep. 66:4-12.) Plaintiff was then taken to the Sixth Precinct. (GN 56.1 ¶ 63.) Plaintiff asserts that, during the ride to the precinct, the handcuffs "tightened up a little bit." (Pl.'s Dep. 67:25-68:3.) According to plaintiff, as a result of being in handcuffs, his wrists became "red and sore." (Pl.'s Dep. 71:17-20.) Plaintiff was released from the precinct with a desk appearance ticket. (GN 56.1 ¶ 64.) Plaintiff's criminal case went to trial. At trial, the jury acquitted him. (GN 56.1 ¶ 69.)

B. Procedural History

Plaintiff filed the initial complaint in this action on January 22, 2008. In September 2008, plaintiff filed an amended complaint. In answering the amended complaint, the County Defendants asserted a cross-claim for contribution and indemnity against the school defendants. Following discovery, the County Defendants and the School-District Defendants each filed motions for summary judgment on November 13, 2009. Plaintiff filed an opposition on December 19, 2009, and defendants filed replies on January 13, 2010. The Court heard oral argument on March 4, 2010. The motion is fully submitted.

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

### A. Section 1983 Claims

To prevail on a claim under § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

### 1. False Arrest and Malicious Prosecution

"Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from

unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (false arrest) and *Conway v. Vill. of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984) (malicious prosecution)).

### a. DeGasperis

### (1) False Arrest

DeGasperis contends that he is entitled to summary judgment on the false arrest claim because he had probable cause to arrest plaintiff based upon the uncontroverted facts in the record that he had available to him, including a school security guard's positive and unequivocal identification, made in a sworn statement, of plaintiff's voice on the 911 call. (*See* County Defs.' Mem. of Law at 7-10.) As set forth below, the Court agrees.

### (a) Probable Cause

"The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007) (quoting *Weyant*, 101 F.3d at 852). In general, probable cause is established where "the [arresting] officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" *Finigan v. Marshall*, 574 F.3d 57, 62 (2d Cir. 2009) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)); *see also Weyant*, 101 F.3d at 852 (citing *Dunaway v. New York*, 442

U.S. 200, 208 n.9 (1979) (additional citations omitted)). Furthermore, "[t]he validity of an arrest does not depend upon an ultimate finding of guilt or innocence." *Peterson v. County of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (citations omitted).

With respect to an officer's basis for probable cause, it is well-established that "[w]hen information [regarding an alleged crime] is received from a putative victim or an eyewitness, probable cause exists . . . unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001); *see also Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed.").

Moreover, a witness's identification of a suspect's *voice* can, in some cases, establish probable cause. *See, e.g.*, *Tuccio v. Papstein*, 516 F. Supp. 2d 199, 204-05 (D. Conn. 2007); *Rizzo v. Edison, Inc.*, 419 F. Supp. 2d 338, 346 (W.D.N.Y. 2005), *aff'd* 172 F. App'x 391 (2d Cir. 2006); *see also Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 255 (1st Cir. 1996) (explaining, in case involving threatening phone calls made to company

management, that, "standing alone," evidence that four employees had identified plaintiff's voice on calls was "sufficient to support a finding of probable cause"). In *Rizzo*, for example, the plaintiff, Mary Rizzo, was a school teacher. The school's secretary received a call from a woman identifying herself as Rizzo and threatening, among other things, to blow up the school. The police responded to the school, and the secretary told the responding officer that she recognized the caller's voice as Rizzo's. Based on the secretary's identification, the police arrested Rizzo and charged her with aggravated harassment. Rizzo subsequently brought a § 1983 false-arrest claim against several defendants, including the arresting officer. The district court granted the arresting officer summary judgment on the false-arrest claim, finding that the arresting officer had probable cause to arrest Rizzo. The court explained that probable cause existed "because the police had information from a citizen witness, [the secretary], that Rizzo phoned in a threat . . . [and] this information was reasonably trustworthy because [the secretary] told [the officer] at the time of the incident that she recognized the caller's voice as [Rizzo's] and informed the officer that the caller had identified herself as Rizzo." 419 F. Supp. 2d at 346. The Second Circuit affirmed this decision in a summary order. 172 F. App'x 391, 396 (2d Cir. 2006). In doing so, it noted that "a voice identification by a witness whose credibility is not in doubt will usually suffice to establish probable cause." *Id.* at 394 n.2.

Similarly here, there is no question that Detective DeGasperis possessed probable cause to arrest plaintiff. After listening to the tape of the 911 call, defendant Colleen Chamblee provided a sworn statement that she had "been working with [plaintiff] on a daily basis for the last two years" and was "positive" that it was plaintiff's voice on the tape. (*See* County Def.'s Ex. F.) Chamblee's identification provided a sufficient basis for probable cause absent questions about Chamblee's credibility.

Plaintiff argues that there were questions about Chamblee's credibility, asserting that she was frequently absent from work and that she was a subject in a drug-related investigation one year *after* she identified plaintiff's voice on the 911 tape. The Court disagrees. As alluded to above, "[w]hen determining whether probable cause exists courts must consider those facts *available to the officer* at the time of the arrest and immediately before it[.]" *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (emphasis in original) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002)). Here, there is absolutely no evidence that DeGasperis was aware of Chamblee's alleged excessive absenteeism or alleged involvement with drugs. Moreover, an event occurring a year after plaintiff's arrest has no bearing on whether probable cause existed at the time of the arrest. In short, Chamblee's sworn statement was sufficient, as a matter of law, to provide probable cause to arrest plaintiff.

In any event, Chamblee was not the only witness who believed the voice on the tape was plaintiff's. At least two (and possibly three) school administrators told DeGasperis, with varying degrees of certainty, that, after hearing the tape, they believed plaintiff was the 911 caller. Even if these school officials were not completely sure that plaintiff was the caller, "'[p]robable cause does not require absolute certainty'"[7] and is assessed in light of the totality of circumstances. *See Jenkins v.*

---

[7] *Panetta*, 460 F.3d at 395 (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 76 (2d Cir. 2003)).

*City of N.Y.*, 478 F.3d 76, 90 (2d Cir. 2007) ("Probable cause is, of course, evaluated on the totality of the circumstances."). Thus, it is unconverted that, by the time he arrested plaintiff, DeGasperis had (1) a sworn affidavit from Chamblee identifying plaintiff as the caller with certainty, and (2) oral statements from school administrators that they believed, based on hearing the tape, that plaintiff was the caller. Under these circumstances, there is no question that DeGasperis had probable cause to arrest plaintiff for making the bomb threat.

Plaintiff's additional arguments to the contrary are unavailing. Although plaintiff faults DeGasperis for not conducting a "voice analysis," (*see* Pl.'s Mem. of Law at 11), the witness identifications of plaintiff's voice provided ample basis for probable cause, and "once probable cause is established the police do not have to endeavor to negate it." *Carson v. Lewis*, 35 F. Supp. 2d 250, 261 (E.D.N.Y. 1999) (collecting cases).

Similarly, plaintiff's assertions regarding the length of the investigation are insufficient to undermine probable cause. Plaintiff argues that the "'overall ambiguity'" surrounding what occurred during the "six-week 'investigation'"[8] between the December 8, 2004 bomb threat and plaintiff's January 26, 2005 arrest creates questions of fact as to probable cause. Again, the Court disagrees. First, there is no evidence DeGasperis became aware of any information during this time that would cast doubt on the Great Neck administrators' statements, made in the days following the incident, that the voice on the 911 tape sounded like plaintiff's. Although school administrators told DeGasperis that Castro had denied making the call, a suspect's denials are insufficient to obviate probable

cause. *Vangemert v. Strunjo*, No. 3:08CV00700(AWT),2010 WL 1286850, at *5 (D. Conn. Mar. 29, 2010) ("'[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause.'" (quoting *Couronyer v. Coleman*, No. 3:01cv221(AWT), 2006 WL 2790403, *14 (D. Conn. Sept. 27, 2006))). Second, the investigation did not lie fallow during this time frame. There is evidence that school officials and DeGasperis made several attempts to contact each other both to provide updated information and to arrange a further meeting. (*See* Hueston Decl. Ex. G (Police Case Report).)[9] Third, although Chamblee did not identify plaintiff as the caller until she heard the tape on January 25, plaintiff presents no evidence that Chamblee had any reason to suspect that plaintiff was the caller before that date.[10] Thus, this is not a case where a victim or witness delays coming forward and that delay creates issues of fact regarding that victim's or witness's veracity. *Cf. Cornett v. Brown*, Civil Action No. 04-CV-0754 (DGT)(LB), 2007 WL 2743485, at *6 (E.D.N.Y. Sept. 17, 2007) (finding probable cause did not exist where, *inter alia*, complainant waited three weeks after incident

---

[8] (*See* Pl.'s Mem. of Law at 14.)

[9] Although not directly raised by the County Defendants, one reason DeGasperis did not return to Great Neck North until January 25 may have been because he took a vacation. Following a December 23, 2004 phone call with principal Kaplan, DeGasperis wrote an entry in the police case report stating that he "arranged to interview [plaintiff] upon me returning from vaca. tentative for 01/10/05." (Hueston Decl. Ex. G.)

[10] (*See* Chamblee Dep. 43:15-20 (Q. Prior to [January 25, 2005], had you ever been informed that Mr. Castro was a suspect in the investigation concerning the December 8th of 2004 bomb threat? A. No.).)

before filing complaint and there was a "three-month gap between the filing of the complaint and any apparent police activity in the case"). Finally, after Chamblee had identified plaintiff as the caller and provided a sworn statement, DeGasperis arrested plaintiff the next day. In short, given the circumstances here, the length of time between the bomb threat and plaintiff's arrest does not create issues of fact regarding probable cause.

Accordingly, DeGasperis is entitled to summary judgment on plaintiff's § 1983 and state-law false arrest claims.[11]

(2) Malicious Prosecution

To succeed on a malicious prosecution claim under § 1983, a plaintiff must show (1) that the defendant commenced or continued a criminal proceeding against him; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice. *Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009); *Drummond v. Castro*, 522 F. Supp. 2d 667, 677-78 (S.D.N.Y. 2007). Malicious prosecution claims under § 1983 also require that there "'be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment.'" *Conte v. County of Nassau*, 06-CV-4746 (JFB)(ETB), 2008 WL 905879, at *11 (E.D.N.Y. Mar. 31, 2008) (quoting *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)).

Here, the County does not dispute that the first two elements are met. DeGasperis arrested plaintiff and commenced a criminal proceeding against him. The proceeding terminated in plaintiff's favor when the jury acquitted him.

With respect to the third element, probable cause for malicious prosecution purposes is assessed "'in light of facts known or reasonably believed at the time the prosecution was initiated,'" and not at the time of arrest. *Drummond*, 522 F. Supp. 2d at 678 (quoting *Carson v. Lewis*, 35 F. Supp. 2d 250, 263 (E.D.N.Y. 1999)). However, if there was probable cause to arrest a suspect, this element can be met only if facts emerge following the arrest showing that the charges against the suspect are groundless. *See Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) ("In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact."); *accord Johnson v. Constantellis*, 221 F. App'x 48, 50 (2d Cir. 2007) ("If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined 'by the discovery of some intervening fact.'" (quoting *Kinzer v. Johnson*, 316 F.3d 139, 143 (2d Cir. 2003))).

Here, there is no evidence that DeGasperis became aware of any such information following plaintiff's arrest. Plaintiff points to the fact that, in 2006, a year after his arrest but before his criminal trial, Chamblee was investigated for an incident concerning the presence of drugs in her work locker. This incident, however, is insufficient to dissipate probable cause. As a threshold matter, there is no evidence that DeGasperis was aware of this incident. Plaintiff argues that "DeGasperis would have been aware of this

[11] As noted above, "[a] section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007).

investigation because police from DeGasperis Precinct [sic] were involved in her investigation." (Pl.'s Mem. of Law at 11.) This conclusory and speculative assertion, however, is insufficient to create an issue of fact as to whether DeGasperis knew about the investigation. *Cf. Torraco v. Port Auth. of N.Y. & N.J.*, 539 F. Supp. 2d 632, 652-53 (E.D.N.Y. 2008) (granting summary judgment to defendants on malicious prosecution claim because probable cause existed for arrest and "speculation" regarding what police officer may have learned following arrest was insufficient to create a triable issue of fact), *aff'd* - - - F.3d - - - -, Docket Nos. 08-1768-cv, 08-1895-cv, 2010 WL 2595312 (2d Cir. June 30, 2010).[12] Moreover, even assuming *arguendo* that the narcotics investigation cast doubt on Chamblee's credibility, nothing about that investigation made "the groundless nature" of the charge against plaintiff apparent. Indeed, as noted above, even without Chamblee's testimony, school administrators also listened to the tape and, based on that, told DeGasperis that they believed, with varying degrees of certainty, that plaintiff was the person who called in the bomb threat. In short, whatever questions may have been raised about Chamblee's credibility, there is no evidence that DeGasperis was aware of any such questions, nor would those questions be sufficient (even if known by DeGasperis) for a rational jury to conclude that, given the totality of the evidence, DeGasperis lacked probable cause to arrest. As such, plaintiff cannot establish the "probable cause" element of his malicious prosecution claim.

Additionally, plaintiff cannot establish the actual malice element. Actual malice "does not require a plaintiff to prove that the defendant was motivated by spite or hatred" but instead that he initiated the criminal proceeding "due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994). Actual malice typically is shown by circumstantial evidence, including a lack of probable cause. *Martin v. City of Albany*, 364 N.E.2d 1304, 1307 (N.Y. 1977). New York courts have held that, while

> lack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue. . . . A jury may infer the [existence] of actual malice from the absence of probable cause.

*Maxwell v. City of N.Y.*, 554 N.Y.S.2d 502, 505 (App. Div. 1990) (internal citations omitted); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause—while not dispositive—tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause." (internal quotation omitted)); *Mesiti v. Wegman*, 763 N.Y.S.2d 67, 70 (App. Div. 2003) ("[T]he jury was able to 'infer the existence of actual malice from the fact that there was no probable cause to initiate the proceeding.'" (quoting *Martin v. City of Albany*, 364 N.E.2d 1304, 1307 (N.Y. 1977))).

---

[12] At oral argument, plaintiff's counsel acknowledged that there was no "direct evidence" that DeGasperis knew about the investigation involving Chamblee. (*See* Oral Argument Audio FTR at 3:57-58.)

As set out more fully above, in connection with the probable cause analyses on both the false arrest and malicious prosecution claims, there was ample basis for DeGasperis to arrest plaintiff, and plaintiff has not identified any exculpatory information that emerged either before or after his arrest. Indeed, the record reflects that, if anything, DeGasperis took a cautious approach to the investigation, waiting to arrest plaintiff until he was able to obtain a sworn statement from a person who positively identified plaintiff as the caller. Under these circumstances, no reasonable jury would find the actual malice element is met because there is no evidence that DeGasperis was motivated by "something other than a desire to see the ends of justice served." As such, plaintiff's § 1983 and state-law[13] malicious prosecution claims fail.

### (3) Qualified Immunity

DeGasperis also contends that even if probable cause did not exist for plaintiff's arrest, he is nonetheless entitled to qualified immunity on the malicious prosecution and false arrest claims. The Court agrees.

The doctrine of qualified immunity shields government officials from civil liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). As the Second Circuit has noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the

discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)). Thus, qualified immunity is not merely a defense but rather is also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the availability of qualified immunity should be decided by a court "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Relevant to this case, an arresting officer is entitled to qualified immunity on claims of false arrest and malicious prosecution if either: (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met. *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007); *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999) (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). The issue of "reasonableness" for purposes of probable cause is distinct from the issue of "reasonableness" for purposes of qualified immunity. *See Kerman v. City of N.Y.*, 374 F.3d 93, 116 (2d Cir. 2004); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that [the] search was objectively legally unreasonable.")). In *Anderson*, the Supreme Court held that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those

---

[13] As noted above, the analysis for a New York state malicious prosecution claim is identical to the analysis for a malicious prosecution claim under § 1983. *Boyd v. City of N.Y.*, 336 F.3d 72, 75 (2d Cir. 2003).

officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." 483 U.S. at 641.

The Second Circuit has defined this standard, which is often referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law.

*Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001) (quotations and citations omitted) (emphasis in original). Moreover, under this standard, "an 'arresting officer is entitled to qualified immunity as a matter of law if the *undisputed facts* and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" *McClellan v. Smith*, 439 F.3d 137, 147-48 (2d Cir. 2006) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

Here, again, multiple witnesses told Detective DeGasperis that, based on hearing the 911 tape, they believed with varying degrees of certainty that plaintiff was the person who made the bomb threat. One of these witnesses, Chamblee, said she was absolutely certain that plaintiff was the caller and signed a sworn statement to that effect. *Cf. Leone v. Fisher*, No. 3:05 CV 521 (CFD), 2007 WL 2874777, at *5 (D. Conn. Sept. 28, 2007) (finding police officer had arguable probable cause to arrest plaintiff for making a threatening phone call to a school where officer had a sworn statement from recipient of the call and was aware of

contents of the call), *aff'd* 312 F. App'x 408, 409 (2d Cir. 2008) ("The school principal . . . told [the officer] about a threatening voice mail message from [plaintiff] that . . . a teacher at the school . . . had received . . . . In a signed, sworn statement, [the teacher] confirmed that she was the recipient of [plaintiff's] threatening voice mail message. Although it is unclear from the record whether [the officer] listened to a recording of the voice mail message, she did review a transcript of the message that had been transcribed by a school secretary. These facts, including the contents of the message, supported [the officer's] reasonable belief that there was probable cause to arrest [plaintiff]."). Under these circumstances, DeGasperis certainly could have reasonably believed that probable cause existed to arrest plaintiff. Thus, even if DeGasperis did not have actual probable cause to arrest plaintiff, there are no triable issues of fact as to whether he had arguable probable cause. Accordingly, DeGasperis is entitled to qualified immunity on the false arrest and malicious prosecution claims.

b. Nassau County

Plaintiff also attempts to hold Nassau County liable on his false arrest and malicious prosecution claims.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipal entity may be held liable under § 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell*, 436 U.S. at 694-95; *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989) and *Monell*, 436 U.S.

at 692-94). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. N.Y. City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). A policy, custom, or practice of the municipal entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson*, 375 F.3d at 226 (quoting *Kern*, 93 F.3d at 44). However, a municipal entity may only be held liable where the entity *itself* commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

Here, as set out above, DeGasperis is entitled to summary judgment on plaintiff's false arrest and malicious prosecution claims. Accordingly, there is no underlying constitutional violation on these claims, and thus, they cannot be the basis of a *Monell* claim. Additionally, even if there was an underlying constitutional violation, plaintiff has produced no evidence of a municipal policy or custom. Instead, he simply asserts, without citing to any evidence, that "the facts suggest a custom, pattern or practice of officers failing to adequately investigate an allegation before making an arrest, thereby causing violations of [an] individual's civil rights." (Pl.'s Mem. of Law at 24.) This conclusory allegation does not allow plaintiff's *Monell* claim to survive summary judgment. Accordingly, the County is entitled to summary judgment on the *Monell* claim.[14]

c. School-District Defendants

(1) State Action

As a threshold matter, the School-District Defendants contend that they cannot be liable under § 1983 for plaintiff's arrest and prosecution because they were not acting under color of state law. As set forth below, the Court agrees.

Plaintiff does not argue that the School-District Defendants are state actors simply because they work for a public school district. (*See* Pl.'s Mem. of Law at 3-9.) He argues, instead, that the School-District Defendants acted under color of state law (1) because they were willful participants in joint activity with DeGasperis and (2) because they conspired with DeGasperis to deprive plaintiff of his civil rights. (*See id.*)

Plaintiff is correct that a private actor may be considered to be acting under the color of state law for purposes of § 1983 if the private actor was "'a willful participant in joint activity with the State or its agents.'" *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). However, the provision of information to or summoning of police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for

---

[14] It appears plaintiff only asserts a *Monell* claim with respect to his false arrest and malicious prosecution claims, not his excessive force claim. (*See* Pl.'s Mem. of Law at 23-24.) In any event, there is no evidence from which a rational jury could find that Nassau County had a policy or custom of placing unreasonably tight handcuffs on an arrestee, nor is there any other basis for a *Monell* claim based upon the alleged excessive force in this case. Therefore, even if asserted as to the alleged excessive force, any such *Monell* claim would not survive summary judgment.

purposes of § 1983. *See Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999) ("Healey's provision of background information to a police officer does not by itself make Healey a joint participant in state action under section 1983. . . . Officer Fitzgerald's active role in attempting to resolve the dispute after Healey requested police assistance in preventing further disturbance also does not, without more, establish that Healey acted under color of law." (citations omitted)); *Drayton v. Toys 'R' Us Inc.*, 645 F. Supp. 2d 149, 163 (S.D.N.Y. 2009) ("'[F]urnishing information to the police does not by itself make someone a joint participant in state action under Section 1983." (quoting *Valez v. City of N.Y.*, No. 08 Civ. 3875, 2008 WL 5329974, at *3 (S.D.N.Y. Dec. 16, 2008)). Similarly, if a police officer's actions are due to the officer's own initiative, rather than the directive of a private party, the private party will not be deemed a state actor. *See Shapiro v. City of Glen Cove*, 236 F. App'x 645, 647 (2d Cir. 2007) ("No evidence supports Shapiro's contention that Weiss-Horvath acted jointly with the Glen Cove defendants to deprive her of her constitutional rights, and ample evidence shows that the Glen Cove officials who searched her house exercised independent judgment rather than acting at Weiss-Horvath's direction."); *Serbalik v. Gray*, 27 F. Supp. 2d 127, 131-32 (N.D.N.Y. 1998) ("'[A] private party does not act under color of state law when she merely elicits but does not join in an exercise of official state authority.'" (quoting *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 388 (5th Cir. 1985))).

Additionally, plaintiff is correct that a private party may act under color of state law when the private party "conspires with a state official to violate the plaintiff's constitutional rights . . . ." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 378 (S.D.N.Y. 2005), *Report and Recommendation adopted in relevant part*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005). To establish a § 1983 conspiracy, plaintiff must produce evidence of (1) an agreement between the private party and state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal. *See Carmody v. City of N.Y.*, No. 05-CV-8084 (HB), 2006 U.S. Dist. LEXIS 25308, at *16 (S.D.N.Y. May 11, 2006) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002)).

With these standards in mind, the Court turns to analyze the evidence with respect to each of the School-District Defendants.

(a) Hugo

There is evidence that assistant principal Hugo met with the police at Great Neck North the day after the bomb threat, listened to the tape, and told the police that she was 70 percent certain that the voice on the tape was plaintiff's. (*See* Hugo Dep. 10:9-13:25.) There is no evidence, however, that she had any further involvement with the police investigation. (*See id.* 16:19-21.) Thus, Ms. Hugo's role was simply to provide information— that is, an identification—to the police. Accordingly, as a matter of law, she was not willfully engaged in joint activity with the police, nor is there evidence that she engaged in any conspiracy.

(b) Chamblee

Similarly, defendant Colleen Chamblee listened to the tape on January 25, 2005, identified plaintiff as the caller, and provided a sworn statement to the police. There is no evidence that she was otherwise involved with the investigation. Therefore, as a matter of law, Chamblee was not a willful participant in joint activity, nor did she act under color of state law as part of a § 1983 conspiracy.

16

(c) Kaplan, Sabatelli, and Cappelletti

In the days following the bomb threat, Principal Kaplan and Director of Security Cappelletti listened to the 911 tape and told Detective DeGasperis that they believed, but were not completely certain, that plaintiff was the caller. Again, this is clearly insufficient, as a matter of law, to establish that these defendants were acting under color of state law.

After this initial interaction, as set out more fully in the background section of this Memorandum and Order, (1) Sabatelli (and possibly Kaplan) interviewed Castro; (2) Cappelletti and Kaplan then spoke separately with DeGasperis about the interview; and (3) it is reasonable to infer that at least one of them determined that Chamblee would be likely to be able to identify the voice on the tape and procured her attendance at the meeting with DeGasperis.

Even viewing this evidence in a light most favorable to plaintiff, it does not raise genuine issues of disputed fact as to whether these defendants acted under color of state of law, and no rational jury could conclude that the state action requirement has been met as it relates to the School-District Defendants. Although plaintiff asserts that defendants' cooperation with the police in the context of supplying the information makes them state actors, "'general allegations of cooperation between private individuals and specific state agents . . . do not make out a claim of action taken under color of state law.'" *Drayton*, 645 F. Supp. 2d at 163 (quoting *Puglisi v. Underhill Park Taxpayer Assoc.*, 947 F. Supp. 673, 706 (S.D.N.Y.1996)).

Moreover, the employees of an organization do not become state actors simply because they conducted an internal investigation of wrongdoing and told the police about the results of that investigation. For example, in *Roche v.*

*John Hancock Mutual Life Insurance Co.*, 81 F.3d 249 (1st Cir. 1996), a plaintiff brought a § 1983 false arrest and malicious prosecution case against his former employer. The employee had been arrested for making threatening phone calls to company officials. The employee's arrest came after the company conducted an internal investigation into the phone calls and then contacted authorities stating that the plaintiff was the likely suspect. The First Circuit rejected the plaintiff's argument that the company was a state actor for § 1983 purposes. 81 F.3d at 253-54. It noted that, after being contacted by the company, the police "independently exercised reasonable professional judgment" in applying for an arrest warrant, a neutral magistrate issued the warrant, "the police dictated the time, place, and manner of the arrest," and the district attorney's office framed the charges and directed the prosecution. 81 F.3d at 254.

Courts in this circuit have employed a similar rule in the context of investigations and detentions of shoplifters by store-security guards. The general rule is that the guards are not acting under color of state law. An exception exists, however, when the police arrest an alleged shoplifter "solely based on the security guard's request, without making an 'independent investigation' of the matter." *See, e.g.*, *Fletcher v. Walmart Stores, Inc.*, No. 05 Civ. 1859 (WHP), 2006 WL 2521187, at *3 (S.D.N.Y. Aug. 28, 2006); *accord Guiducci v. Kohl's Dep't Stores*, 320 F. Supp. 2d 35, 37 (E.D.N.Y. 2004) (collecting cases and dismissing § 1983 case brought against store-security guards based on guards' detention, interrogation, and strip search of suspected shoplifters).

Similarly, here, whatever the extent of any internal investigation by Kaplan, Sabatelli, and Cappelletti, and whatever efforts they

made to contact DeGasperis, there is no evidence from which a jury could find that DeGasperis failed to exercise his own professional judgment in conducting the investigation and in ultimately deciding to arrest plaintiff. Although school-district officials initially identified plaintiff as a suspect on December 9, DeGasperis made additional trips to the school and conducted additional interviews before arresting plaintiff. Furthermore, after interviewing Chamblee at the school on January 25, 2005, DeGasperis had Chamblee come to the Sixth Precinct where she actually signed the supporting deposition. (Chamblee Dep. 50:21-25.) In short, the only conclusion that a rational jury could draw from this record is that DeGasperis conducted his own investigation on the incident and did not simply rely on the school officials' assertion that they believed Castro was the caller.

The police also, as in *Roche*, dictated the "time, place, and manner" of plaintiff's arrest. The day after Chamblee signed the supporting deposition, DeGasperis and another detective went back to the school and waited for Castro in Sabatelli's office. Sabatelli testified that, after he summoned Castro, "the two detectives were standing and . . . proceeded to . . . I guess arrest him. . . . I believe the detectives told him what the reason was for his arrest and they . . . handcuffed him behind his back and took him out of my office." (Sabatelli Dep. 46:14-25.) Nothing in Sabatelli's testimony (or in the other evidence in the record) indicates that he was involved in deciding to arrest plaintiff or in placing plaintiff under arrest.

Given these uncontroverted facts, no rational jury could conclude that these defendants were willfully engaged in joint activity with DeGasperis, and, thus, they cannot be liable under § 1983 for plaintiff's arrest and prosecution. Furthermore, there is no evidence that these defendants made any agreement with

DeGasperis to deprive plaintiff of his constitutional rights, and, thus, there can be no § 1983 conspiracy claim against them. Therefore, they were not acting under color of state law in connection with plaintiff's arrest and prosecution. Moreover, even if they were somehow acting under color of state law, there was no underlying constitutional violation because, as discussed above, probable cause existed for plaintiff's arrest and prosecution.

Accordingly, the Court grants the School-District Defendants' motion for summary judgment on plaintiff's § 1983 false arrest and malicious prosecution claims.[15]

### 2. Excessive Force

Plaintiff also contends that Detective DeGasperis violated his constitutional rights by placing unreasonably tight handcuffs on him during his arrest. (*See* Am. Compl. ¶ 19.) DeGasperis seeks summary judgment on this claim. However, as discussed below, the Court concludes that there are disputed issues of material fact that preclude summary judgment on this issue.

A police officer's use of force is excessive in violation of the Fourth Amendment "if it is objectively unreasonable 'in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation.'" *Maxwell v. City of N.Y.*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). More specifically, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

---

[15] Plaintiff does not assert any state-law claims against the School-District Defendants.

countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations and internal quotations omitted).

"Frequently, a reasonable arrest involves handcuffing the suspect, and to be effective handcuffs must be tight enough to prevent the arrestee's hands from slipping out." *Esmont v. City of N.Y.*, 371 F. Supp. 2d 202, 214 (E.D.N.Y. 2005) (citing *Cavazos v. Voorhies*, 00-CV-7929 (RAG), 2002 WL 31017492, at *3 (N.D. Ill. Sept. 5, 2002)). To determine whether handcuffing of an arrestee is reasonable, the handcuffing must be viewed "in light of the minimal amount of force necessary to maintain custody of [the arrestee]." *Esmont*, 371 F. Supp. 2d at 215. "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Id.* (citing *Burchett v. Kiefer*, 310 F.3d 937, 944-45 (6th Cir. 2002) (additional citation omitted)).

Applying that standard here, triable issues of fact exist as to the reasonableness of DeGasperis's handcuffing of plaintiff. There is evidence that the first two factors are met. At his deposition, plaintiff testified that he told DeGasperis that the handcuffs were too tight and that DeGasperis did not respond. (Pl.'s Dep. 66:4-12.) With respect to the third factor, plaintiff testified at his deposition that the handcuffs left imprints on his wrists and caused his wrists to become "red and sore." (*Id.* 71:9-20.) Although the Court recognizes that a plaintiff who suffers only *de minimis* injuries may not be able to survive summary judgment on an excessive force claim, "the Second [C]ircuit has indicated that a very minimal injury is sufficient to trigger potential liability" for excessive force. *Yang Feng Zhao v. City of N.Y.*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009) (recommending denial of summary judgment on

excessive force claim based on allegation that detective pressed plaintiff's head against a table and plaintiff's testimony that this resulted in pain for "about an hour"), *Report and Recommendation adopted*, 656 F. Supp. 2d 375 (S.D.N.Y. 2009); *Sforza v. City of N.Y.*, No. 07 Civ. 6122(DLC), 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) ("[P]laintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient."). And, here, the record is unclear as to the intensity and duration of plaintiff's soreness or discomfort. Viewing the facts in the light most favorable to Castro and resolving all factual ambiguities in his favor—as the Court must on DeGasperis's motion for summary judgment—a rational jury could find that the soreness Castro claims to have experienced was sufficiently severe to be a cognizable injury under § 1983. Thus, summary judgment is not appropriate on this record. *Cf., e.g.*, *Sforza*, 2009 WL 857496, at *15 (denying summary judgment on excessive force claim where granting summary judgment would have "require[d] that inferences be inappropriately drawn in the [defendant's] favor"); *Lucky v. City of* N.Y., No. 03 Civ. 1983 (DLC), 2004 WL 2088557, at *7 (S.D.N.Y. Sept. 20, 2004) ("While Lucky's injuries appear *de minimis*, his statements that he was shoved in the police car in a manner that injured his shoulder and that the handcuffs were placed so as to leave red marks on his wrists raise material issues of fact not addressed by the defendants. Summary judgment is therefore inappropriate on Lucky's claim for excessive force."); *accord Lyons v. City of Xenia*, 417 F.3d 565, 575-76 (6th Cir. 2005) ("The Fourth Amendment, it is true, prohibits unduly tight handcuffing in the course of an arrest. And this general principle, it is also true, was 'clearly established' under Sixth Circuit case law at the time of Lyons' arrest. Not all

allegations of tight handcuffing, however, amount to excessive force. In order to reach a jury on this, the plaintiff must allege some physical injury from the handcuffing and must show that officers ignored plaintiff's complaints that the handcuffs were too tight." (citations omitted)); *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (finding summary judgment and qualified immunity unwarranted where plaintiff asserted that officer placed handcuffs on him that were excessively tight and failed for ten minutes to loosen them despite repeated requests); *see also Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) (explaining, in reversing district court's grant of summary judgment on excessive force claim, that plaintiff's failure to seek medical treatment was "not fatal" to her claim and that focus of inquiry should be reasonableness of force under the circumstances).[16]

Accordingly, the Court denies DeGasperis summary judgment on plaintiff's § 1983 excessive force claim and his state-law assault and battery claims.[17]

### 3. First Amendment Retaliation

Plaintiff also alleges that the School-District Defendants violated his First Amendment rights. Specifically, he contends that he "repeatedly complained to principal Bernard Kaplan that the school administration

---

[16] As noted above, the Court recognizes that *de minimis* injuries, from which a rational jury could not find excessive force, cannot survive summary judgment. *See, e.g., Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468-69 (S.D.N.Y. 2008) ("There is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." (collecting cases)). The Court notes that, in a number of the cases cited by *Lynch* for this proposition, the plaintiffs apparently alleged no injury at all from the handcuffs, only that the handcuffs were too tight. *See Drummond v. Castro*, 522 F. Supp. 2d 667, 679 (S.D.N.Y. 2007) ("Here, Plaintiff alleges that during his arrest he was handcuffed tightly, but he does not allege any injury from the handcuffing or other circumstances of the arrest."); *Grant v. City of N.Y.*, 500 F. Supp. 2d 211, 217 (S.D.N.Y. 2007) ("Plaintiff has neither alleged nor introduced any facts which suggest that she was in any way physically harmed as a result of being placed in handcuffs by Officer Murria."). Although it is clear that some type of injury is required to prevail on a § 1983 excessive force claim, plaintiff in the instant case has submitted sworn testimony that the handcuffs were too tight, that his request

that the handcuffs be loosened was ignored, and that he sustained an injury. Given the current record, there is no basis for the Court conclude that the injury was so *de minimis* that it must fail as a matter of law, and, thus, summary judgment is unwarranted.

[17] The Court also denies the motion for summary judgment on the related state-law claims because the same standard applies to those claims. *See Kramer v. City of N.Y.*, No. 04-CV-0106 (HB), 2004 WL 2429811, at *11 (S.D.N.Y. Nov. 1, 2004) ("In the context of state officers performing their lawful duties, New York State law regarding assault and battery parallels the federal laws regarding excessive force."). Additionally, the Court notes that DeGaseperis does not assert in his moving papers that he is entitled to qualified immunity on plaintiff's excessive force claims (*see* County Defs.' Mem. of Law at 13-14) and does not address the excessive force claims in his reply brief. Even if qualified immunity were asserted on this claim, the disputed issues of fact outlined above would also preclude summary judgment on that ground at this juncture. *See, e.g., Calamia v. City of N.Y.*, 879 F.2d 1025, 1036 (2d Cir. 1989) ("The right of an individual not to be subjected to excessive force has long been clearly established."); *accord Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (denying qualified immunity where plaintiff "claim[ed] that [officer] fastened [plaintiff's] handcuffs so tightly around his wrist that they caused [plaintiff] pain and left bruises that lasted for several weeks").

was too lax in enforcing the school parking rules." He contends that the School-District Defendants retaliated against him for making these complaints by claiming that he was the person who made the December 2004 bomb threat.

To establish a First Amendment retaliation claim under § 1983, plaintiff must establish that (1) the speech at issue was protected; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected speech and the adverse employment action. *Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004). The School-District Defendants do not dispute that plaintiff suffered an adverse employment action, nor do they dispute that they are state actors for purposes of this § 1983 claim. They do assert, however, that the First Amendment does not protect the speech at issue and that there is no causal connection between the speech and the adverse employment action. As set forth below, the Court agrees. There is no evidence to support this claim, and summary judgment is warranted.

a. Protected Speech

Courts employ a two-part test to determine whether a public employee[18] engaged in protected speech. First, the court asks "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "If the answer [to this question] is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* However, "[i]f the answer is yes," then the court must examine whether the employer "had an adequate justification for treating the employee differently from any other member of the general public." *Id.*

Here, the First Amendment does not protect plaintiff's speech because he was not speaking "as a citizen on a matter of public concern." This standard itself contains two separate requirements—namely, (1) that the employee speak as a citizen, and (2) that the employee speak on a matter of public concern. If either of these requirements is not met, then plaintiff's First Amendment retaliation claim must fail as a matter of law. *See Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009). With respect to the first part of this standard—whether the employee was speaking as a "citizen"—the Supreme Court in *Garcetti* explained that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." 547 U.S. at 421; *Weintraub v. Bd. of Ed. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 201 (2d Cir. 2010). Determining whether an employee spoke "pursuant to" his official duties requires a "practical" inquiry in which no one factor is necessarily dispositive. *See Weintraub*, 593 F.3d at 202. Some factors the Court may consider include the plaintiff's job description; the persons to whom the speech was directed; and whether the speech resulted

---

[18] The School-District Defendants assert that the standards for First Amendment retaliation claims involving public employees apply here; plaintiff does not, and could not, dispute the applicability of that standard. It is well settled that, even though he was a contract employee, the standards for public employees also apply to individuals who work as contractors for government agencies. *See, e.g.*, *Rockland Vending Corp. v. Creen*, No. 07-cv-6268 (KMK), 2009 WL 2407658, at *11 (S.D.N.Y. Aug. 4, 2009); *Ansell v. D'Alesio*, 485 F. Supp. 2d 80, 84 (D. Conn. 2007) ("Numerous courts, including the Supreme Court, have concluded that for purposes of retaliation claims brought under the First

Amendment, there is no legal distinction between independent contractors with pre-existing contracts . . . and full-time employees.").

from special knowledge gained through the plaintiff's employment. *Caraccilo v. Vill. of Seneca Falls*, 582 F. Supp. 2d 390, 405 (W.D.N.Y. 2008). Additionally, the Second Circuit has recently held that "speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in the employee's job description, or in response to a request by the employer." *Weintraub*, 593 F.3d at 203 (finding that teacher's filing of union grievance was done pursuant to official duties and therefore not protected by the First Amendment because grievance related to plaintiff's concerns about his ability to maintain discipline in the classroom). In sum, "[a]lthough there is no simple checklist or formula by which to determine whether the employee was speaking as a private citizen or as a public employee . . . the cases distinguish between speech that is the kind of activity engaged in by citizens who do not work for the government and activities undertaken in the course of performing one's job." *Caraccilo*, 582 F. Supp. 2d at 410 (quotation marks and citation omitted).

Here, there is no question that plaintiff was speaking pursuant to his official duties when he spoke to defendant Kaplan regarding his concerns about parking regulations. Plaintiff essentially admits as much in the declaration he submitted in opposition to summary judgment. In paragraph 3, he asserts that he "repeatedly complained to Principal Bernard Kaplan that the school administration was too lax in enforcing school parking rules." In the very next paragraph, he explains that "[t]he students double parked, and parked illegally, and *it was one of my responsibilities to enforce school parking regulations*." (Pl.'s Decl. ¶ 4 (emphasis added).)[19] Thus, by plaintiff's own admission,

his speech was related to—indeed, at the core of—his duties as a school security guard whose specific responsibilities involved the enforcement of parking regulations. Moreover, the speech was directed to Kaplan, the school's principal, who was responsible for the school's overall operation, including its safety and security.[20] Thus, plaintiff directed his complaints up the operational chain of command. This fact further underscores that plaintiff was speaking in his role as a security guard—and not as a citizen—when complaining about conditions in the parking lots. *See Thompson v. District of Columbia*, 530 F.3d 914, 916 (D.C. Cir. 2008) ("Ordinarily, employees who make recommendations to their supervisors on subjects directly related to their jobs are carrying out their official duties and thus receive no First Amendment protection."); *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008) ("Cases from other circuits are consistent in holding that when a public employee raises complaints or concerns up the chain of command at his workplace about his job duties, that speech is undertaken in the course of performing his job" (collecting cases)). Additionally, there is no evidence plaintiff spoke to anyone outside the school regarding the parking issues. This further indicates that plaintiff was not speaking as a "citizen" when he made the complaints. *See,*

---

[19] Plaintiff also testified at his deposition that his "specific duties and responsibilities" concerned "enforcing the parking of the students, making sure

they parked in their designated lots and not in the teachers' lots." (Pl.'s Dep. 25:20-26:8.)

[20] (Kaplan Dep. 6:8-14 ("I am in charge of everything that goes on. You know, the buck stops at the principal's office. I am in charge of security, safety, [and] the educational program. I am responsible for everything that happens in the high school.").) Although plaintiff was technically employed by a private contractor, it is undisputed that school-district officials, including Kaplan, supervised his day-to-day work. (*See* Pl.'s Dep. 30:15-18; 43:24-46:4.).

*e.g.*, *Healy v. City of N.Y. Dep't of Sanitation*, 286 F. App'x. 744, 746 (2d Cir. 2008) (affirming summary judgment for defendant and holding that report of corruption was made within scope of official duties where, *inter alia*, the plaintiff uncovered the corruption while performing an assigned task and there was no evidence of external communications).

In sum, given the uncontroverted facts in this record, plaintiff was clearly speaking pursuant to his official duties. As such, he was not speaking as a citizen, and, regardless of whether the parking issues were a "matter of public concern,"[21] the First Amendment does not protect his speech. Therefore, his retaliation claim fails as a matter of law.

### b. Causal Connection

Plaintiff's retaliation claim also fails, in the alternative, because he has not shown the requisite causal connection between his speech and any adverse employment action.

Plaintiff must demonstrate that his speech was "a substantial motivating factor" in any adverse employment action. *Washington*, 373 F.3d at 321. This causal connection can be demonstrated by plaintiff "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'" *Cobb v.*

---

[21] *See, e.g.*, *Caraccilo*, 582 F. Supp. 2d at 410 (finding, on a motion for summary judgment, that although speech at issue related to a matter of public concern, it "was made . . . pursuant to [plaintiff's] job duties, rather than 'as a citizen' . . . [and s]uch speech is not constitutionally protected"); *Mulcahey v. Mulrenan*, No. 06 Civ. 4371(LBS), 2008 WL 110949, at *7 n.2 (S.D.N.Y. Jan. 3, 2008) ("Because this Court finds that the plaintiff did not speak as a citizen but rather pursuant to his official duties, we need not address the remaining elements of plaintiff's prima facie claim.").

*Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)). However, "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead he must produce 'some tangible proof to demonstrate that his version of what occurred was not imaginary.'" *Cobb*, 363 F .3d at 108 (quoting *Morris*, 196 F.3d at 111 (alteration and internal citation omitted)).

Additionally, "[i]n this Circuit, an inference of causation is defeated (1) if the allegedly retaliatory [action] took place at a temporal remove from the protected activity; or (2) if there was an intervening causal event that occurred between the protected activity and the allegedly retaliatory [action]." *Tasadfoy v. Ruggiero*, 365 F. Supp. 2d 542, 551 (S.D.N.Y. 2005) (citation omitted).

Here, plaintiff has failed to produce any proof of a causal connection between his speech and the School-District Defendants telling police that they believed that he was the 911 caller. The only evidence that the speech even occurred is a statement in plaintiff's declaration that he "repeatedly complained" to defendant Kaplan. There is no indication of the temporal proximity between plaintiff's complaints and defendants' actions in response to the bomb threat nor is there evidence of retaliatory motive. Additionally, there is an "intervening causal event" between the speech at issue and the School-District Defendants identifying plaintiff to the police. That event is the School-District Defendants hearing a voice on the tape and perceiving it to be plaintiff's. There is no evidence that the School-District Defendants did not honestly believe plaintiff was the caller. Thus, given this record, no rational jury could conclude that the required causal connection existed. Therefore, in the alternative, plaintiff's First

Amendment retaliation claim fails for this additional reason.[22]

In sum, the undisputed facts demonstrate that plaintiff did not engage in protected speech, nor is there evidence of a causal connection between plaintiff's speech and his becoming a suspect in the bomb threat investigation. Accordingly, summary judgment is warranted on this claim in favor of the School-District Defendants.

### B. Section 1985 Claim

Plaintiff also alleges a conspiracy to deprive him of his civil rights, in violation of 42 U.S.C. § 1985(3). Defendants argue that there is no evidence of a conspiracy, nor is there evidence that any conspiracy was motivated by class-based discriminatory animus, which is a required element for claims under § 1985. The Court agrees.

Section 1985(3) prohibits conspiracies by two or more persons that interfere with and injure any person's civil rights. More specifically, the four elements of a § 1985(3) claim are:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*Mian v. Donaldson, Lufkin & Jenrette Secs., Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993) (internal citation omitted). "Furthermore, the conspiracy must also be motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'" *Id.* (quoting *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983)).

Here, no reasonable jury could find that defendants engaged in a civil-rights conspiracy. First, as discussed more fully in connection with plaintiff's § 1983 claim, there is no evidence from which a jury could find that any of the School-District Defendants conspired with defendant DeGasperis. Moreover, plaintiff offers no evidence of any agreement among any of the School-District Defendants. *See generally Rivera v. Goord*, 119 F. Supp. 2d 327, 345 (S.D.N.Y. 2000) (explaining that "[t]he mere use of the word 'conspiracy,' without more, does not state a claim under § 1985").[23]

---

[22] Additionally, the Court notes that plaintiff asserts that he complained only to Kaplan about parking. He does not cite to any evidence suggesting that the other School-District Defendants knew about his complaints. Thus, plaintiff's retaliation claim against these defendants would fail for the additional reason that there is no evidence that they were personally involved in any constitutional violation, which is an essential element of any § 1983 claim against an individual. *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005) ("Before § 1983 damages are awarded, a plaintiff must show by a preponderance of the evidence that the defendant was personally involved—that is, he directly participated—in the alleged constitutional deprivations."). Similarly, to the extent plaintiff brings any First Amendment claim against DeGasperis, any such claim would fail for similar reasons.

---

[23] Additionally, although not raised by defendants, the intra-corporate conspiracy doctrine would bar any conspiracy between the School-District Defendants. Under this doctrine, which the Second Circuit has applied in § 1985(3) cases, "there can be no conspiracy if the conspiratorial

Second, there is no evidence from which a reasonable jury could find discriminatory animus. As evidence of such animus, plaintiff relies heavily on the fact that (1) he is a Hispanic American, and that (2) two defendants—Kaplan and Sabatelli—made references during their depositions to the fact that plaintiff had a Hispanic accent and that the 911 caller had a Hispanic accent. (See Pl.'s Opp. Mem. of Law at 9 (citing Pl.'s 56.1 ¶¶ 34-35).)

Plaintiff's reliance on Kaplan's and Sabatelli's deposition testimony is misplaced. In Kaplan's case, he testified, in the context of describing DeGasperis playing the 911 tape and him then determining that the tape sounded like plaintiff, that plaintiff had a "certain kind of accent that is very distinctive." (Kaplan Dep. 31:4-5.) Plaintiff's counsel followed up by asking "[w]hat is distinctive about his accent?" Kaplan replied,

> In our community, first of all, we have a small Spanish population, a few Spanish really, and his—his tone and—umm—his decadence [sic] of the way he speaks is very distinctive of him. . . . [T]hat's why when I heard the voice, I knew the voice.

(Kaplan Dep. 31:8-14.) Even viewing this statement in a light most favorable to plaintiff, the only conclusion a rational jury could draw from it is that Kaplan identified plaintiff's voice on the tape based in part on plaintiff's accent. No rational trier of fact could conclude from this statement that, as plaintiff argues, he "was singled out as the anonymous caller because he was one of the few Hispanics working at the school." (Pl.'s Opp. Mem. of Law at 9.)

Sabatelli's testimony is also not probative of discriminatory animus. Plaintiff's counsel asked Sabatelli to "describe Mr. Castro's accent." Sabatelli responded "Umm. Perhaps a Hispanic accent." Plaintiff's counsel then asked Sabatelli to describe the "type of an accent" that the 911 caller had. Sabatelli responded "Hispanic." (Sabatelli Dep. 33:18-24.) This testimony does not even suggest that plaintiff's accent played a role in Sabatelli's eventual[24] identification of plaintiff

conduct challenged is essentially a 'single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment.'" *Tucker v. N.Y. City*, No. 05 Civ. 2804(GEL), 2008 WL 4450271, at *11 (S.D.N.Y. Sept. 30, 2008) (quoting *Hermann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (granting summary judgment on § 1985(3) claim where "[e]very defendant in this action was employed by the DOE and was acting in his or her capacity as a DOE employee in connection with the alleged conspiracy"); *accord Little v. City of N.Y.*, 487 F. Supp. 2d 426, 442 (S.D.N.Y. 2007) (granting summary judgment on § 1985(3) claim where "[p]laintiff allege[d] that police officers conspired with each other to violate his rights . . . , but all the police officers—including Officers Strong and Blain—[were] part of a single corporate entity, the City of New York."). Here, by definition, the School-District Defendants all worked for the Great Neck School District, a single entity. As such, the intra-corporate conspiracy doctrine would apply. *Cf. Steipen v. Schaubert*, No. 08CV487A, 2010 WL 1875763, at *6 (W.D.N.Y. Feb. 23, 2010) (recommending summary judgment be granted to defendant school-board members on § 1985(3) claim based on intra-corporate conspiracy doctrine), *Report and Recommendation adopted*, 2010 WL 1875769 (W.D.N.Y. May 11, 2010); *see also Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509-10 (6th Cir. 1991).

[24] As noted above, Sabatelli was initally unable to identify plaintiff as the caller. After hearing the tape again, he became "painfully certain" that plaintiff had made the bomb threat. (Sabatelli Dep. 44:23-45:6.)

as the 911 caller. In sum, based on this record, no rational trier of fact could find that discriminatory animus motivated any of the defendants.

In sum, because there is no evidence of either a conspiracy or discriminatory animus, plaintiff's § 1985(3) claim fails to survive summary judgment.

C. State-Law Claims

Plaintiff has brought a number of state-law claims against the County Defendants.[25] As discussed above, the same analysis that applies to plaintiff's § 1983 false arrest and malicious prosecution claims also applies to plaintiff's state-law false arrest and malicious prosecution claims. Similarly, the same analysis that applies to plaintiff's § 1983 excessive force claim also applies to plaintiff's state-law assault and battery claims.

The remaining state-law claims are claims for "fabricated evidence, harassment, abuse of process, gross negligence, and negligent hiring, supervision, monitoring, and retention of incompetent employees." (Pl.'s Opp. Mem. of Law at 20.)

Plaintiff contends that summary judgment is inappropriate on these claims because the County did not directly address them in its motion papers. The Court disagrees. First, the County has moved for summary judgment on all of plaintiff's claims. (*See, e.g.*, County Def.'s Reply Mem. of Law at 9 (requesting "an Order granting summary judgment in their favor and dismissing the Amended Complaint . . . in its entirety").) Second, although the factual basis for all the remaining state-law claims is not

entirely clear, they all appear to concern alleged improprieties relating to the investigation of the bomb threat and plaintiff's arrest and prosecution.[26] However, the County Defendants have argued that they acted properly in carrying out their investigation and in arresting and prosecuting plaintiff, and the Court has determined that no triable issues of fact exist as to whether DeGasperis had probable cause to arrest and prosecute plaintiff. Simply put, regardless of how plaintiff labels the claims, there are no triable issues of fact related to the propriety of County Defendants' decision to arrest and prosecute plaintiff. Accordingly, the Court grants the County summary judgment on the remaining state-law claims.

The Court notes, however, because the state-law assault and battery claims against DeGasperis survive summary judgment, the County could still be liable for these claims under a *respondeat superior* theory.[27] Thus,

---

[25] Plaintiff does not raise any state-law claims against the School-District Defendants. (*See* Oral Argument Audio FTR at 3:46.)

[26] (*See, e.g.*, Pl's Opp. Mem. of Law at 21 (citing, in support of abuse of process claim, to portions of Rule 56.1 statement dealing with DeGasperis's investigation of the bomb threat); *id.* at 22 (asserting that plaintiff's gross negligence claim should survive summary judgment because plaintiff has "rebutted defendants' assertions concerning the legitimacy of his arrest and prosecution"); *id.* at 22-23 (asserting that Nassau County can still be liable on "theories of negligent hiring, negligent retention, and negligent supervision" because "the total inadequacy of defendants' 'investigation' supports the inference that the municipality had a pattern of allowing officers to violate individuals' civil rights . . . .").)

[27] *See Williams v. City of White Plains*, - - - F. Supp. 2d - - - -, No. 08 CIV 5210-WGY, 2010 WL 2465405, *5 (S.D.N.Y. June 16, 2010) ("Summary judgment is denied as to Sgt. Tiedemann with regard to the section 1983 claim of use of excessive force and the state law claim of assault and battery, and the City of [W]hite

those state-law claims against DeGasperis and the County survive summary judgment.

### D. County's Cross-Claim for Contribution

The School-District Defendants have also moved for summary judgment on the County's cross-claim against them for indemnification and contribution.

To the extent the County seeks indemnification and contribution on plaintiff's § 1983 claims, they cannot do so as a matter of law. No right to contribution exists under § 1983. *See Crews v. County of Nassau*, 612 F. Supp. 2d 199, 208 (E.D.N.Y. 2009) (collecting cases). Nor is there a federal right of indemnification under the statute. *See Hayden v. Hevesi*, No. 05-CV-0294E(SR), 2007 WL 496369, at *4 (W.D.N.Y. Feb. 12, 2007).

Nor can the County obtain indemnification or contribution from the school district on plaintiff's state-law claims. "An action for contribution may be maintained between concurrent, successive, independent, alternative, and even intentional tort-feasors, who have caused the 'same injury' to plaintiff." *LNC Invs., Inc. v. First Fidelity Bank, Nat. Assoc.*, 935 F. Supp. 1333, 1346 (S.D.N.Y. 1996) (internal quotations omitted)). Here, the only

state-law claims surviving summary judgment deal with DeGasperis's handcuffing of plaintiff. There is no evidence the School-District Defendants played any role in handcuffing plaintiff or in allegedly declining to loosen the handcuffs. Therefore, they are not potential joint tortfeasors with DeGasperis, and any contribution claim must fail.

Unlike contribution, "[i]ndemnity . . . flows from either a contractual or other relationship between the actual wrongdoer and another, such as that of employee and employer, and involves a complete shifting of the loss." *Riviello v. Waldron*, 391 N.E.2d 1278, 1283 (N.Y. 1979) (internal citations omitted); *see also Durable Mfg. Co. v. Goodyear Tire & Rubber Co.*, 992 F. Supp. 657, 660 (S.D.N.Y. 1998) ("[C]ontribution involves joint tortfeasors whereas indemnification involves vicarious liability."). Here, there is no evidence of a "contractual or other relationship" whereby the School-District Defendants are liable for the County Defendants' torts. As such, the claim for indemnity also fails.

### IV. CONCLUSION

For the reasons set forth above, the Court grants the School-District Defendants' motion for summary judgment in its entirety. The Court also grants the County Defendants summary judgment on (1) plaintiff's § 1983 claims for false arrest, malicious prosecution, and municipal liability; (2) plaintiff's § 1985(3) conspiracy claim; and (3) plaintiff's state-law causes of action related to those claims. However, the Court denies summary judgment on plaintiff's § 1983 excessive force claim against DeGasperis and on plaintiff's state-law assault and battery claims against DeGasperis and the County. Plaintiff and the County Defendants shall participate in a

---

Plains, which remains as a respondeat superior defendant should Sgt. Tiedemann be found liable for assault and battery.")*; Webster v. City of N.Y.*, 333 F. Supp. 2d 184, 207 (S.D.N.Y. 2004) (explaining that, even though court granted city summary judgment on *Monell* claim, "Plaintiffs' common-law causes of action against the City proceeding on a theory of respondeat superior may proceed" (collecting cases)). *See generally Raysor v. Port Authority of N.Y. & N.J.*, 768 F.2d 34, 38 (2d Cir. 1985) (dismissing that § 1983 *Monell* claim against Port Authority but allowing state-law causes of action against Port Authority to proceed on a *respondeat superior* theory).

telephone conference on Wednesday, September 22, 2010 at 4:30 p.m. to set a schedule for submission of a joint pre-trial order. At that time, counsel for the County Defendants shall initiate the call and, once all parties are on the line, contact Chambers at (631) 712 5670.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:     September 13, 2010
           Central Islip, New York

* * *

Plaintiff is represented by Michael O. Hueston, 350 Fifth Avenue, Suite 4810, New York, NY 10118. The School-District Defendants are represented by Steven C. Stern and Melissa L. Holtzer, Sokoloff Stern, LLP, 355 Post Avenue, Suite 201, Westbury, NY 11590. The County Defendants are represented by John Ciampoli, Nassau County Attorney, One West Street, Mineola, NY 11501, by Liora M. Ben-Sorek, Deputy County Attorney.